989 A.2d 829

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. L.L., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF T.L., A MINOR–RESPONDENT.

Argued September 30, 2009—Decided February 24, 2010.

212

*T. Gary Mitchell,* Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, Parental Representation, attorney; *Alan I Smith,* Designated Counsel and *Beatrix W. Shear,* Deputy Public Defender, on the briefs).

*Lisa J. Rusciano,* Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (*Anne Milgram,* Attorney General of New Jersey, attorney; *An-*

drea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Rusciano and Patricia L. Parker, Deputy Attorney General, on the briefs).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for respondent T.L. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney).

Ronald K. Chen, Public Advocate, argued the cause for amicus curiae Public Advocate of New Jersey (Mr. Chen, attorney; Mr. Chen, Jo Astrid Glading, Assistant Public Advocate, and Joseph F. Suozzo, First Assistant Child Advocate, of counsel and on the brief).

Melville D. Miller, Jr., President, argued the cause for amicus curiae Legal Services of New Jersey (Mr. Miller, attorney; Mr. Miller, Diana Dunker, Mary M. McManus–Smith, and Jeyanthi C. Rajaraman, on the brief).

Mary E. Coogan, submitted a brief on behalf of amicus curiae Association for Children of New Jersey.

Justice WALLACE, JR., delivered the opinion of the Court.

Based on Loren Lilly's [1] inability to overcome her drug and anger problems and to provide a safe home for her children, the New Jersey Division of Youth and Family Services (Division) sought and obtained custody of two of her children. The Division subsequently filed a complaint for kinship legal guardianship. As a result, in May 2005, Loren's sister, Jane Weir, was granted kinship legal guardianship of then four-year old Terry Lilly.

In January 2007, Loren filed a motion to vacate the kinship legal guardianship. Following a hearing, the trial court denied the motion and the Appellate Division affirmed. We now affirm. We hold that pursuant to N.J.S.A. 3B:12A–6(f), prior to the vacation of a kinship legal guardianship judgment, the court must find by clear and convincing evidence both that the parent has

---

[1] The names of the mother, children, and guardian have been changed to protect their privacy.

overcome the incapacity or inability to care for the child that led to the original guardianship proceedings, and that termination of kinship legal guardianship is in the best interest of the child. We additionally hold that the party seeking to terminate the kinship legal guardianship has the burden to prove by clear and convincing evidence each of those two criteria.

## I.

Loren is the mother of four children. At the time the Division first became involved, in 2001, she had three children. Only one of these children, Terry, is the subject of this appeal. In September 2001, the police responded to a report that Loren hit her twelve-year old daughter, Lois, with a frying pan. Loren was arrested and the children came under the care and custody of the Division. Initially, the Division placed the children with Loren's mother and later, with the current caretaker, Loren's sister, Jane Weir.

Following the removal of the children and their temporary placement with Jane, the Division referred Loren for outpatient substance abuse treatment at Renaissance House. However, she stopped treatment after attending the program for approximately three months. The Division next referred Loren to the New Hope Program, another outpatient program. However, after approximately two months, Loren was discharged from the program. In its efforts to reunite Loren with her children, the Division also offered Loren other services, including psychological evaluations, parenting skills classes, and visitation.

After reunification efforts were unsuccessful, the Division filed a petition for kinship legal guardianship under *N.J.S.A.* 30:4C–87(a). Following an evidentiary hearing in May 2005, the trial court found by clear and convincing evidence that Loren had unresolved drug and anger issues, and that her inability to perform parenting functions was unlikely to change in the foreseeable future. The court concluded it was in the best interest of Terry to award kinship legal guardianship to her Aunt Jane. The trial court also

ordered that visitation between Loren and Terry occur at the discretion of Jane.

Following the entry of the order, Jane was hopeful that Loren would overcome her problems and eventually be able to care for her children. She allowed Loren to visit Terry whenever she wanted. Jane even gave Loren a key to her apartment to facilitate visits. Subsequently, Loren visited Terry almost daily with the duration of visits ranging from a couple of hours to the entire day.

On July 15, 2006, Loren enrolled in New Directions, a drug treatment program. At one point, she tested positive for barbiturates. Ultimately, on March 9, 2007, Loren was discharged from the program for lack of attendance.

Meanwhile, in January 2007, twenty-one months following the entry of the order creating the kinship legal guardianship, Loren filed a motion to vacate the kinship legal guardianship to regain custody of Terry. She later obtained counsel. Sometime after Loren filed the motion, the relationship between Loren and Jane soured. Jane claimed that Loren disrespected her home and was increasingly violent during the visits. Consequently, Jane discontinued visitation between Loren and Terry, and changed the locks to her apartment.

The trial court held a three-day evidentiary hearing on Loren's motion. In addition to her own testimony, Loren offered the testimony of Dr. Gerald Figurelli, a psychologist, and her then eighteen-year old daughter, Lois.

Dr. Figurelli testified that Loren was not experiencing clinically significant symptoms of depression, helplessness or hopelessness. He opined that she was in sustained full remission from her history of cocaine dependence and that Loren's participation in aftercare treatment and a twelve-step recovery process would aid the continuation of a sustained recovery from her drug problem. Dr. Figurelli testified that a parenting stress index test revealed that there was no evidence suggesting that Loren "displayed

attitudes or other aspects involved in parenting that would adversely impact her capacity to parent adequately." In his report, he concluded that as long as Loren did not use psychoactive substances, participated in services such as psychiatric monitoring (to determine treatment for symptoms), attended counseling (to address her underlying depression and anger issues), and utilized other rehabilitation programs she had the capacity to adequately parent Terry.

Lois, who had recently moved in with her mother after turning eighteen, testified on behalf of Loren. Prior to that time, Lois also lived with Jane, who was her kinship legal guardian. Lois confirmed that her mother frequently visited Terry at Jane's apartment. Except for one incident, Lois said she never observed any problems while living with Jane. The one incident referred to occurred when Jane's seven-year old son touched Terry's backside. Lois said she reported the incident to Jane but that Jane did nothing about it. Lois admitted that she never told Loren or the Division about that incident.

Loren testified on her own behalf. On February 2, 2006, five months before entering New Directions for the second time, Loren claimed she stopped using cocaine and had begun taking positive steps on her own to avoid using drugs. Those steps included spending time with her father and sisters, discontinuing contact with old friends, and moving to a new neighborhood. She asserted that her September 2006 positive drug screen at New Directions was not attributable to unlawful drugs, but rather the test results were due to her use of Percocet and arthritis medicine she received from Newark Beth Israel Hospital to treat her dislocated shoulder.

Loren acknowledged that she was currently on one-year probation for a disorderly conduct conviction stemming from an altercation that she had with a man. She testified that the man owed her money for braiding his hair, and he failed to pay her the correct amount. She later visited the man at his home, at which time the man became hostile and pushed and shoved her. Loren testified

that the man claimed that she stabbed him in the back, but she denied that accusation.

The Division presented the testimony of Hanan Stevens, a Division intake investigator. Stevens testified that a May 2007 inspection of Loren's apartment revealed no living room furniture and no bed in one of her two bedrooms. Stevens reported that Loren told her that she was barely making ends meet, and that she did not have the means to support Lois, who had recently returned to live with her. Conversely, Stevens testified that she inspected Jane's home and found it to be very orderly with adequate furniture and plenty of food in the pantry. She said that Terry seemed happy and very content with Jane.

Terry's Law Guardian called Jane as a witness. Jane claimed that she loved Terry very much, that she was a mother figure to Terry, and that it was her desire to continue as Terry's legal guardian. She noted that Terry is an excellent student in school. Jane explained that she stopped Loren's visitation with Terry because Loren was becoming increasingly violent with Lois, who until recently had lived with Jane. Jane said that Loren disrespected her home in front of Jane's other children and her neighbors. Nevertheless, she agreed that if Loren would act appropriately, she would allow Loren to resume visiting Terry at her home. Finally, Jane related that she applied for a "domestic violence order" against Loren as a result of an incident on August 12, 2007, that occurred outside her home while the children were playing.[2]

[2] The details of the August 12, 2007 incident are not discussed in the record. However, during a temporary adjournment of the case, in a separate proceeding before the same trial court, Jane's application for a domestic violence restraining order was granted. Subsequently, the trial court indicated in this case that the basis for the restraining order was harassment and criminal mischief by Loren against Jane. Under the terms of the domestic violence order, Loren was "ordered to go to batterer's intervention services" and "counseling to address these anger issues[.]" In addition, visitation with Terry was prohibited until Loren, at a minimum, began the required counseling.

Finally, the Law Guardian reported that then nine-year old Terry wished to remain with Jane, and that Terry would be happy to resume visits with her mother. The Law Guardian also expressed her opposition to the termination of the kinship legal guardianship.

The trial court denied Loren's motion to vacate the kinship legal guardianship. The trial court found portions of Dr. Figurelli's report and testimony contradicted each other. The doctor opined that Loren had the potential to adequately parent, yet in his report he made recommendations for services she needed in order to meet that potential. The recommended services included psychiatric monitoring, the need for Loren to address her underlying anger issues, and that Loren participate in drug treatment and parenting skills programs. The court also noted that Loren failed to reveal to Dr. Figurelli that she recently had been arrested for stabbing someone. Nor was Dr. Figurelli made aware of the fact that subsequent to his evaluation, Jane had obtained a domestic violence restraining order against Loren.

The trial court found that Loren was a credible witness and in sustained full remission of her drug problem. However, the court found that Loren's major anger problems had not been resolved, as evidenced by the assault incident and the restraining order obtained by Jane. The court concluded that the evidence was clear and convincing that it would not be in the best interest of Terry to be removed from Jane's home where she is flourishing.

Loren appealed. In an unpublished opinion, the Appellate Division affirmed. The panel held that the trial court properly placed the burden of proof on the parent seeking to terminate the kinship legal guardianship. The panel found sufficient credible evidence to support the trial court's finding that Loren failed to prove by clear and convincing evidence that the circumstances leading to the original order, namely Loren's drug addiction and anger issues, were adequately overcome, and that it was in Terry's best interest to terminate the guardianship.

We granted Loren's petition for certification. 197 *N.J.* 476, 963 *A.2d* 845 (2009). We also granted amicus curiae status to the Public Advocate of New Jersey, the Association for Children of New Jersey, and Legal Services of New Jersey (Legal Services).

## II.

Loren contends that, although the applicable statute requires a parent who moves to vacate a kinship legal guardianship to prove by clear and convincing evidence that the incapacity on which the guardianship was based has been cured, the lesser standard of preponderance of the evidence applies to the parents' responsibility to demonstrate that it is in the child's best interest to vacate the kinship legal guardianship. Further, she adds that a parent's motion to vacate should not be denied based on an incapacity other than the incapacity that resulted in the guardianship order unless that incapacity is proved by the opposing party by clear and convincing evidence. Applying her formulation of the requisite standards to the facts here, Loren argues that the trial court erred in denying her motion to vacate the judgment.

The Division argues that the clear and convincing evidence standard applies to both prongs of the statutory tests and that the moving party has the burden of proof. The Division adds that the Legislature intended that kinship legal guardianship be a permanent option and it also required a high standard of proof to vacate an order. The Division urges that Loren failed to meet either prong of the test by clear and convincing evidence. The Division notes that the trial court did not abuse its discretion in rejecting Dr. Figurelli's opinions, and that the court appropriately considered the restraining order as a factor in denying Loren's motion, because one of the original causes of her losing custody of her daughter was due to an incident in which she hit one of her children with a frying pan. Thus, the Division urges that Loren's behavior that led to the granting of a restraining order in favor of Jane evinced the same qualities of uncontrolled anger.

The Law Guardian agrees with the Division that the party seeking to vacate a kinship legal guardianship order has the burden to prove both prongs of the statutory test by clear and convincing evidence. The Law Guardian contends that a party seeking to vacate an order bears a heavy burden of proof, because a child should not be disrupted from a permanent and stable placement without strong justification for such a profound change.

The Public Advocate essentially agrees with the Division's position. The Advocate also argues that the statutory language explicitly places the burden of proof upon the moving party. The Advocate contends that the clear and convincing standard serves the compelling state interest in promoting permanency for a child by protecting a kinship legal guardianship from casual revision.

The Association for Children also agrees with the Division's position that the clear and convincing evidence standard is placed on the party moving to vacate the judgment. The Association contends that the higher clear and convincing evidence standard is necessary to determine if disrupting the child's current living situation is in the child's best interest.

Legal Services agrees with the Division that the parent has the burden to establish by clear and convincing evidence that the two prong test has been satisfied. Legal Services urges that the Court develop a list of "best interest" factors for trial courts to consider to include: safety, a child's wishes, parental role, continuing relationships (with child's guardian and parent), sibling relationships, and the practical impact on the child's daily life.

### III.

This appeal requires us to interpret *N.J.S.A.* 3B:12A–6(f) of the Kinship Guardian Act, *N.J.S.A.* 3B:12A–1 to –7 (Kinship Act or Act).

### A.

The primary rule of statutory construction is to ascertain the intent of the Legislature by looking at the plain words used in

the statute. *See N.J. Div. of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 403, 968 *A.*2d 698 (2009) (applying rules of statutory construction). In reviewing the words chosen by the Legislature "courts should ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." *Ibid.* (citation and internal quotation marks omitted). When the words of the statute are clear, we should enforce the statute as written. *Ibid.* On the other hand, if the meaning of the statute is not clear or the words permit more than one interpretation, "the court may utilize extrinsic evidence" as an aid in reaching the appropriate meaning. *Ibid.* (citation and internal quotation marks omitted).

## B.

In *New Jersey Division of Youth & Family Services v. A.W.*, 103 *N.J.* 591, 609, 512 *A.*2d 438 (1986), this Court recognized the need to provide greater flexibility in situations where a grandparent or a close relative is the caregiver. The Court quoted approvingly a law review article that expressed the view that

[w]hen a child is placed with a relative, termination is both unnecessary and unwise unless the relative wishes to adopt the child or is unwilling to provide long-term care. As long as the relative is willing to provide care until the parents can resume custody, the child's needs for stability and attachment are satisfied. In fact, initiating termination might place the relative in the awkward position of having to act against the parents.

[*Ibid.* (quoting Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights,* 28 *Stan. L.Rev.* 623, 697 (1976)).]

The Legislature essentially agreed with that reasoning when it adopted the Kinship Act, effective January 1, 2002. *N.J.S.A.* 3B:12A–1 to –7. The Kinship Act established "a new type of legal guardianship that addresses the needs of children and caregivers in long-term kinship relations." *N.J.S.A.* 3B:12A–1(d). In its findings, the Legislature recognized that an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the

child or children. *N.J.S.A.* 3B:12A–1(a)–(b). Thus, the Legislature established kinship legal guardianship as an alternative permanent placement option without the need for termination of parental rights and "where adoption is neither feasible nor likely[.]" *N.J.S.A.* 3B:12A–1(c).

A kinship legal guardian is defined as "a caregiver who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood, and who is appointed the kinship legal guardian of the child by the court[.]" *N.J.S.A.* 3B:12A–2 (citation omitted). The kinship legal guardian has "the same rights, responsibilities and authority relating to the child as a birth parent," subject to several expressed limitations. *N.J.S.A.* 3B:12A–4(a)(1). The birth parent retains the right to consent to an adoption or a name change, remains obligated to pay child support, and retains the right of visitation or parenting time with the child, as determined by the court. *N.J.S.A.* 3B:12A–6(e)(2)–(4). Moreover, kinship legal guardianship does not eliminate any rights the child may have "derived from the child's parents, including, ... those relating to inheritance or eligibility for benefits or insurance[.]" *N.J.S.A.* 3B:12A–6(e)(5).

The requirements for the appointment of a kinship legal guardian are similar to the standards for termination of parental rights set forth in *N.J.S.A.* 30:4C–15.1. *See N.J.S.A.* 3B:12A–6(d). Prior to the appointment of a kinship legal guardian, the court must find by clear and convincing evidence that:

(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which the [D]ivision is involved with the child ... (a) the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and

(4) awarding kinship legal guardianship is in the child's best interests.

[*Ibid.* (citations omitted).]

Once the court approves the kinship legal guardianship, the guardianship continues until "the child reaches 18 years of age or . . . is no longer continuously enrolled in a secondary education program, whichever event occurs later[.]" *N.J.S.A.* 3B:12A–4(a)(6).

The Kinship Act provides three circumstances in which a court may intervene to vacate an order awarding kinship legal guardianship prior to the child's eighteenth birthday. One circumstance is if the court finds by clear and convincing evidence "that the guardian failed or is unable, unavailable or unwilling to provide proper care and custody of the child[.]" *N.J.S.A.* 3B:12A–6(g). The second circumstance is if the court finds "that the [kinship legal] guardianship is no longer in the child's best interests." *Ibid.* The third circumstance is if a parent makes an application for the return of the child to her or his care and "based upon clear and convincing evidence, the court finds *that the parental incapacity or inability to care for the child that led to the original award of kinship legal guardianship is no longer the case and termination of kinship legal guardianship is in the child's best interests.*" *N.J.S.A.* 3B:12A–6(f) (emphasis added).

We note that the court may request that the Division be involved in the case or the Division may determine that it wishes to take a position in the case. *N.J.A.C.* 10:132A–3.5(a), (b). The regulations under the Kinship Act provide in part that

(a) The Division representative prepares a parenting assessment of a child's parent when the court is determining whether the kinship legal guardianship order should be vacated and the child returned to his or her parent and one of the following occurs:

 (1) The court requests the parenting assessment because the Division was originally involved in petitioning the court to grant kinship legal guardianship in accordance with *N.J.A.C.* 10:132A–3.3(a) and (b); or

 (2) There is prima facie evidence to support vacating the kinship legal guardianship order and the Division wants to take a position on the parent's motion to vacate the kinship legal guardianship order.

(b) The Division determines whether to take a position on the motion after evaluating the factors listed in *N.J.A.C.* 10:132A–3.6.

[*Ibid.*]

Thus, the Division is required to perform an assessment either when the court requests one because of the Division's prior

involvement or when the Division elects "to take a position on the [parent's] motion." *Ibid.*

## C.

█ We need only address the circumstances under *N.J.S.A.* 3B:12A–6(f) when a parent makes application for the return of the child to his or her custody. In that event, the plain words of the statute require that when a parent seeks to vacate an order for kinship legal guardianship, based on the evidence presented, the court must find by clear and convincing evidence that "the parent has regained the ability to care for the child and termination of the guardianship is in the child's best interests." *N.J. Div. of Youth & Family Servs. v. P.P.*, 180 *N.J.* 494, 510, 852 *A.2d* 1093 (2004) (citing *N.J.S.A.* 3B:12A–6(f)).

In our view, *N.J.S.A.* 3B:12A–6(f) requires a clear and convincing evidence standard for both prongs of the test. Contrary to Loren's position, we find no justification to interpret the statute to require a standard of proof other than clear and convincing evidence for the best interest of the child prong of the test. Indeed, the higher clear and convincing evidence standard is consistent with the legislative purpose to provide a "permanent placement option, beyond custody, without rising to the level of termination of parental rights[.]" *N.J.S.A.* 3B:12A–1(c).

█ Facially, the Act does not designate which party bears the burden of satisfying the two-prong test before a kinship legal guardianship may be vacated. Nor does our review of the legislative history of the Kinship Act shed any light on this issue. Importantly, the parties all agree that the burden of proof should be on the moving party. We agree.

Moreover, placing the burden of proof on the moving party is consistent with the conclusion this Court reached in a related case in which a parent sought to vacate a judgment terminating her parental rights due to "her inability to overcome her drug and alcohol addictions and provide a safe home for [her son]." *In re Guardianship of J.N.H.*, 172 *N.J.* 440, 473, 799 *A.2d* 518 (2002).

In finding no prohibition to a parent making a motion to vacate a judgment pursuant to *Rule* 4:50–1, we declared that such a motion "must be supported by evidence of changed circumstances [and t]he moving party bears the burden of proving that events have occurred subsequent to the entry of a judgment" that justify vacating the judgment. *Ibid.* (citation and internal quotation marks omitted). We made it clear, however, that in a "termination case, the primary issue is . . . what effect the grant of the motion would have on the child." *Id.* at 475, 799 *A.*2d 518.

In sum, it is fair and reasonable that we place the burden of proof on the moving party. In the present case, the mother is the moving party. Thus, the trial court properly placed the burden of proof upon the mother to demonstrate by clear and convincing evidence (1) a change in her life that would support a finding that she has regained the ability to care for her child, and (2) that termination of the kinship legal guardianship is in the best interests of the child.

## D.

We turn now to assess whether Loren met her burden of proof to demonstrate that the kinship legal guardianship order should be vacated. As noted, the trial court denied her motion to vacate.

We have stated often that we defer to a trial court's factual findings "because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." *N.J. Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (quoting *N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 293, 914 *A.*2d 1265 (2007)). We have long recognized that "[b]ecause of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding." *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998). Thus, if there is substantial credible evidence in the record to support the trial court's findings, we will not disturb those findings. Nevertheless,

if the trial court's conclusions are "clearly mistaken or wide of the mark[,]" an appellate court must intervene to ensure the fairness of the proceeding. *E.P.*, *supra*, 196 *N.J.* at 104, 952 *A.2d* 436 (citation and internal quotation marks omitted).

■ Here, Loren sought to establish the first prong of the test, that she had regained the ability to care for her daughter, essentially through both her testimony and the testimony of Dr. Figurelli. The court noted that there were apparent contradictions between Dr. Figurelli's report and testimony. When confronted, Dr. Figurelli affirmed his opinion that Loren had the capacity to adequately parent. The trial court rejected Dr. Figurelli's testimony and relied on Dr. Figurelli's report that included numerous recommendations for services that were necessary to sustain her remission and address her history of depression and anger issues.

Although addiction to drugs is a treatable condition, and Loren had made substantial progress in overcoming her addiction, she failed to present sufficient credible evidence for her sustained, long-term sobriety. Further, Dr. Figurelli acknowledged that he knew Loren had some anger management problems and those issues might trigger substance abuse issues. Importantly, the evidence showed that Dr. Figurelli was not aware that Loren had recently been arrested for stabbing someone and that, subsequent to his report, the kinship legal guardian had obtained a domestic violence restraining order against Loren. Based on the record, we are satisfied that there was sufficient credible evidence for the trial court to find that Dr. Figurelli's testimony was contradictory and unpersuasive and to conclude that Loren failed to satisfy the first prong of the test.

■ The second prong of the test requires the moving party to prove by clear and convincing evidence that vacating an order of kinship legal guardianship is in the child's best interests. The statute does not provide what factors shall be considered in determining the best interests of the child. We have stated "the paramount concern ... is the safety of our children." *G.M.,*

*supra*, 198 *N.J.* at 397, 968 *A.*2d 698 (citing *N.J.S.A.* 9:6–8.8(a)). Clearly, the safety of the child is a key factor.

In its regulations, the Division sets forth nine factors that it considers "related to the child's safety when determining whether to take a position on a motion to vacate a kinship legal guardianship order[.]" *N.J.A.C.* 10:132A–3.6(a). Those factors are:

1. The child's age;

2. The duration of the Division's involvement with the child, prior to the granting of kinship legal guardianship;

3. The total length of time the child was in out-of-home placement;

4. The length of time the child has lived with the guardian, prior to and after the granting of kinship legal guardianship;

5. When kinship legal guardianship was granted;

6. What the original harm or risk of harm to the child was;

7. The parent's present fitness to care for the child;

8. Any subsequent allegations of abuse or neglect received by the Division and their findings; and

9. What plan is proposed for the child if the guardianship is vacated.

[*Ibid.*]

 To be sure, in addressing the best interests of the child, the list above will aid the court, but that list is not exhaustive. In general, we agree with Legal Services that additional factors also may be considered. Those factors include the child's wishes; the nature and quality of the parent-child relationship during the kinship legal guardianship; the future relationship anticipated between the child and the guardian; the preservation of sibling relationships; the practical impact of vacating the kinship legal guardianship on the child's day-to-day life (i.e. changes in school, community and friends); and any other relevant factor bearing on the best interests of the child.

Obviously, in some cases not all of the above factors will apply. For example, if there are no siblings or the child is not of sufficient age to express a preference, then those factors cannot be considered. In short, the trial court must consider an array of relevant factors in determining whether vacating the kinship legal guardianship is in the best interest of the child.

As noted, the trial court accepted the testimony of Jane that Terry was thriving in her care; found that Loren did not have sufficient resources to parent Terry; and found that, based on the domestic violence restraining order proceedings, Loren still had "an untreated and unaddressed and out-of control anger problem." Further, contrary to Loren's assertion, Loren's anger problem was not a new factor considered for the first time. The evidence presented at the hearing that resulted in the kinship legal guardianship judgment included Loren's previous conduct of hitting her daughter with a frying pan. In short, there was sufficient credible evidence to conclude that Loren failed to adduce by clear and convincing evidence that it was in the best interest of Terry to vacate the kinship legal guardianship.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.